```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2    - - - - - - - - - - - - - - - x
     JASON LEOPOLD,
3                                   CA No:  1:15-cv-00123-RC
                  Plaintiff,
4                                   Washington, D.C.
                                    Tuesday, February 9, 2016
5    vs.                            2:32 p.m.

6    U.S. DEPARTMENT OF STATE,

7                  Defendant.
     - - - - - - - - - - - - - - - x
8    _____

9                  TRANSCRIPT OF STATUS CONFERENCE
           HELD BEFORE THE HONORABLE RUDOLPH CONTRERAS
10                   UNITED STATES DISTRICT JUDGE
     _____
11   APPEARANCES:
     For the Plaintiff:      RYAN STEVEN JAMES, ESQ.
12                           LAW OFFICE OF RYAN S. JAMES
                             5208 Capricorn Loop
13                           Killeen, TX 76542
                             (254) 289-7459
14                           rsjameslaw@gmail.com

15                           JEFFREY LOUIS LIGHT, ESQ.
                             LAW OFFICES OF JEFFREY LIGHT
16                           1712 Eye Street, NW, Suite 915
                             Washington, DC 20006
17                           (202) 277-6213
                             jeffrey@lawofficeofjeffreylight.com
18
     For the Defendant:      ROBERT J. PRINCE, ESQ.
19                           U.S. DEPARTMENT OF JUSTICE
                             P.O. Box 883
20                           Washington, DC 20044
                             (202) 305-3654
21                           robert.prince@usdoj.gov

22   Court Reporter:         Lisa A. Moreira, RDR, CRR
                             Official Court Reporter
23                           U.S. Courthouse, Room 6718
                             333 Constitution Avenue, NW
24                           Washington, DC  20001
                             202-354-3187
25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription
```

```
 1                      P R O C E E D I N G S
 2            THE COURT:  Okay.  Civil action 15-123, Jason
 3    Leopold vs. The United States Department of State.  Counsel,
 4    please step forward to the podium and state your appearances
 5    for the record.
 6            MR. JAMES:  Your Honor, this is Ryan James
 7    appearing for plaintiff telephonically, plaintiff Jason
 8    Leopold.
 9            THE COURT:  That wasn't very clear.
10            MR. JAMES:  My apologies, Your Honor.  This is
11    Ryan James, counsel for plaintiff, Jason Leopold, appearing
12    telephonically.
13            THE COURT:  Okay.
14            MR. JAMES:  Good afternoon, Your Honor; Jeffrey
15    Light, also for plaintiff, Jason Leopold.
16            THE COURT:  Good afternoon.
17            MR. PRINCE:  Good afternoon, Your Honor.  I'm
18    Robert Prince from the Department of Justice.  With me at
19    counsel table is Marcia Berman, also from Department of
20    Justice, and James Bair from the legal -- Office of the
21    Legal Advisor for Department of State.
22            THE COURT:  Okay.  Why don't you stay there,
23    Mr. Prince.
24            All right.  First, let's start with giving me an
25    update as to whether anything has happened since Friday,
```

1    when you filed a status report.

2        MR. PRINCE:  No, Your Honor, except that agencies

3    are returning documents daily in fairly large numbers.

4        THE COURT:  Okay.  Explain to me in some detail,

5    once the agencies return the documents, what the State

6    Department has to do.

7        MR. PRINCE:  Yes, Your Honor.  So once the

8    documents are received from the interagencies -- now,

9    remember that several -- many of the documents went to more

10    than one agency.  So once they come in, the FOIA office has

11    to consolidate and incorporate all the appropriate

12    interagency recommendations.  Then it has to be submitted to

13    a legal review.  That involves taking the consolidated

14    documents, sending it to the Office of the Legal Advisor,

15    who then has their attorneys review it to make sure it's

16    okay.

17        After that, it goes into what's called the final

18    review phase.  That involves incorporating all the

19    recommendations that might involve discussions with

20    agencies, bureaus within State, and Office of the Legal

21    Advisor, sometimes us at Department of Justice, to figure

22    out the final redacted form.  And then a final version is

23    prepared for redactions.

24        After that, you enter what's called the posting

25    process.  That means you have to transfer documents to the

1    FOIA website.  Now, if you recall, they currently reside on

2    the secret system.  That's just where the FOIA system sits.

3            So it's obviously a very involved process to go

4    from the classified system to what's actually a public-

5    facing system.  There are several steps in the middle.

6    They're moved to the internal sensitive-but-unclassified

7    network at State, a final quality control is performed, and

8    then the documents are moved -- they're what's called

9    staged, which is when basically a copy of the website that's

10   maintained internally that's set up so people will see what

11   it looked like to the public, and finally they're moved to

12   the public-facing website and made available.

13           THE COURT:  And typically, how long does that

14   post -- once you get back a response from all the agencies

15   for a particular document, how long does that internal State

16   Department process take?

17           MR. PRINCE:  It can take quite awhile.  For one

18   thing, the posting process itself is usually done in batch.

19   There are very significant economies of scale if you're

20   doing a lot as opposed to a few.

21           The reviews, generally they come in.  It takes

22   some time -- I'm not exactly sure how long -- to get the

23   redactions from the agencies consolidated, then it goes to

24   legal review.  That might take as long as a week, maybe

25   longer.  And then the final process, you know, can take

1    another week or two.  And this is happening -- except for

2    the posting process, which will be done kind of all at once,

3    this is done as they come in.  So it's -- different

4    documents are at different stages of this process.

5              THE COURT:  Okay.  Are there any documents that

6    are ready to go but for the posting process?

7              MR. PRINCE:  There are at this point approximately

8    570 documents -- that's not pages; it's documents -- that

9    have completed the legal review, and a large portion of

10   those are probably done with the final review at this point.

11   But there would still need to be the posting process.  In

12   fact, I think that they're -- still part of the final review

13   is going on for several of those.

14             THE COURT:  Okay.  Let's get those up by Friday.

15             MR. PRINCE:  Your Honor, I don't think that's at

16   all possible.

17             THE COURT:  Why?

18             MR. PRINCE:  When we're talking about the

19   possibility of such things, it was that -- first of all,

20   there is -- you know, they are working weekends.  So there's

21   a long weekend that there will be many people working, and

22   the thought was the earliest it could go up would be the

23   18th or so.

24             THE COURT:  Which is what day of the week?

25             THE COURTROOM DEPUTY:  Thursday.

1           THE COURT:  So a week from this Thursday?

2           MR. PRINCE:  Yes, Your Honor.

3           THE COURT:  Why is that?  If you said a

4    significant portion of those have passed legal review and

5    the final review, and all that's left is posting, why would

6    it take that long?

7           MR. PRINCE:  Well, the posting process takes

8    awhile.

9           THE COURT:  Okay.

10          MR. PRINCE:  And the other part of it is that the

11   people who do the posting process do the other parts of this

12   as well.  So in order to make sure -- I mean, State is

13   pushing toward really finishing by the end of the month, and

14   we're worried that if we just pulled everything in to rush

15   them out as quickly as possible, that that could slow down

16   things because if things get stalled in the process, they're

17   not moving forward.  And what we need is to keep the

18   documents moving through that process.

19          THE COURT:  Okay.  Well, then answer me this

20   question.  I mean, the posting is not part of my order.

21   That was the State Department's decision.  How much faster

22   could it just be sent to the plaintiff?

23          MR. PRINCE:  I don't think it would be any faster.

24   And, in fact, it would create more work so that it would end

25   up with things getting posted later.  I mean, the plaintiff

1    might get them earlier, but I don't know that -- I don't

2    think that would be any faster.  I'd have to go back and

3    check for sure, but the same quality control is still going

4    from -- ultimately out to the public.

5            THE COURT:  Okay.  Explain to me again why

6    something that's gone through the reviews could not be

7    posted any earlier than a week from Thursday.

8            MR. PRINCE:  Well, Your Honor, it's gone through

9    the legal review, but I'm not sure how much of it's through

10    the final review.

11            THE COURT:  But you said there's a segment of it

12    that has gone through the final review.  Isn't that what you

13    said?

14            MR. PRINCE:  Yes, Your Honor.

15            THE COURT:  Okay.  So assuming that subset, why

16    would it take until a week from Thursday to just simply post

17    those?

18            MR. PRINCE:  Because, Your Honor, it's -- what

19    I've been told by my client is that this is an involved

20    process.  You have to move things across different systems.

21    You have to perform quality control steps at each stage.  It

22    takes people with a particular skill set to do it.  They're

23    also involved in the rest of the process in trying to keep

24    those documents moving.

25            THE COURT:  Okay.  Let's say -- let's put posting

1    aside.  What if we said the plaintiff could just come in and

2    inspect them on a screen.  How quickly could that happen?

3         MR. PRINCE:  I think that would take longer.  I

4    mean, there's security protocols to get people on screen.

5    There has to be a segregated portion of the network.  I

6    assume that they'd want it on the same type of computer

7    that's in the public-facing section so that there's no

8    access to, you know, internal State -- now, this is all just

9    based on what I know of the system.  This is not something I

10   consulted directly with my client about.

11        THE COURT:  I mean, it just -- you know, it's not

12   my system so I can't say for sure, but that seems an

13   unreasonably long period of time to post or give access to

14   something that's already past the clearances.

15        MR. PRINCE:  Your Honor, there's a lot happening

16   right now.  I mean, that's really what this is about.

17        THE COURT:  Okay.  But it doesn't sound like a lot

18   from what you just explained to me.  I understand that the

19   systems are complex, but that's over a week's time.

20        MR. PRINCE:  I mean, this is what I've been

21   informed of, and it's -- you know, the worry is that we end

22   up pushing -- is that we increase the risk to the final

23   deadline the more we deviate from keeping -- again, we want

24   to keep the documents moving through this multi-step

25   process.

1        THE COURT:  Uh-huh.  I mean, but that's how we

2   started the case, is that the State Department wanted

3   everything to be done -- for purposes of efficiency and

4   orderliness, that everything be supplied on January 29th,

5   but we couldn't possibly do it on a rolling basis.  And then

6   we did it on a rolling basis, and it seems to have been

7   going fine.

8        I understand that there are inherent interests in

9   order, but, you know, to state the obvious, these documents

10  have a lot of public interest, and the timing is important

11  for the reasons stated by the plaintiff.  So work with me in

12  figuring out a way we can produce these on a rolling basis.

13       MR. PRINCE:  Well --

14       THE COURT:  What do you think could be done?

15       MR. PRINCE:  Well, Your Honor, the most that could

16  be done is one single interim production.  It would

17  dramatically push back the final date if we had to do more

18  frequent updates than that.

19       Again, if you pull people off -- for example, if

20  the person is responsible for consolidating agency reviews,

21  and they have to be pulled off to do an update, then that

22  delays when legal gets them, and then that delays when they

23  get submitted for the final review and the reconciliation,

24  if any, can happen.

25       It's the same people kind of moving across

1    different steps of the process here.  And, again, there are

2    economies of scale from doing it in large batches rather --

3    there's a certain amount of overhead no matter how many

4    they're doing, plus it's more for a bigger one than a

5    smaller production, but there is a big fixed cost to each

6    production.

7        So, you know, one -- you know, one interim

8    production is something that the State believes is feasible.

9    Again, roughly like the 18th.  Maybe it could be pushed

10   earlier by a day, but certainly after the long weekend would

11   be a huge help to this.

12       THE COURT:  And by an interim production, what

13   percentage of the 7,000 pages, would you say?

14       MR. PRINCE:  There are approximately 3,700

15   documents, and it's approximately 570 that would be in the

16   interim production.  Maybe some more would get in at that

17   point, but I don't know.  Off the top of my head, that's

18   about a little less than one-sixth, a little more than --

19   I'm sorry, no, a little less than one-seventh or about one-

20   seventh.

21       THE COURT:  Okay.  And then the balance would be

22   on February 29th?

23       MR. PRINCE:  That's correct.  Because as of

24   yesterday, Your Honor, there's 2,000 still at the agencies,

25   and they're coming back.  We are getting them, but, as you

 1   know, this is the kind of thing that kind of builds up as

 2   the month goes forward, and then they move through the

 3   process.

 4          THE COURT:  All right.  Do you have anything to

 5   add to that?

 6          MR. PRINCE:  Not on this topic, Your Honor.

 7          THE COURT:  All right.  Let me hear from the

 8   plaintiff.

 9          MR. JAMES:  Thank you, Your Honor.  In addition to

10   the issues that have been briefed regarding the current

11   email, there is a second issue with respect to the Part 2 of

12   this case, and there's a question whether or not the

13   defendants have been providing records that are, in fact,

14   not responsive that we'll need to visit.

15          But to address the issues that the Department of

16   Justice has just made, I understand he said 570 documents of

17   the approximately 3,000 documents that are outstanding, at

18   which, you know, obviously we say the sooner the better, but

19   we have been talking in this case about page numbers so it's

20   not clear how many pages 570 documents represent.  It might

21   be useful to have more information on that, if it's

22   available.

23          We also believe that it might be helpful to get

24   more information in the form of formal affidavits or

25   informal representations about what these agencies --

1  whether or not State Department has gone to these agencies

2  and sought information about how quickly each agency can

3  turn around the record, especially if they can present that

4  information to the Court to help determine what deadline or

5  deadlines might be reasonable.

6          To the extent that the representation that a

7  second interim production would create additional costs and

8  work that could delay the final production beyond February

9  29th, we would be opposed to that, and we would instead

10  request that the Court consider simply moving the February

11  29th final production up by a week or more so that the extra

12  work that the State Department is going to have to do to

13  catch up would be toward the final resolution of the issue

14  as opposed to simply the interim release.

15          THE COURT:  Say that last thing again.

16          MR. JAMES:  And the reasoning, Your Honor, is

17  just --

18          THE COURT:  No, no, repeat what it is you said.

19  You're not coming in that clearly.

20          MR. JAMES:  My apologies.  We would just ask that

21  the Court -- instead of adopting interim relief that would

22  create potentially additional work, we would ask that the

23  Court instead consider just moving up the final production

24  by a week or more instead of dividing it up into two

25  additional productions, especially if the defendant has

1    represented that could potentially push the second

2    production past the February 29th adjusted deadline that

3    they are proposing.

4              THE COURT:  So what I'm understanding is that

5    instead of saying have an interim production on the 18th and

6    then the final one on the 29th, you're just saying have one

7    on the 22nd or so?

8              MR. JAMES:  Yes, Your Honor.

9              THE COURT:  Okay.

10             All right.  I mean, that doesn't sound feasible

11   because they're still relying on the agencies getting

12   information back to them.

13             MR. JAMES:  And that's why, Your Honor, we believe

14   it would be important to get information from those agencies

15   about what their projected turnaround dates are so the Court

16   could fashion an order that considered that information.

17             THE COURT:  All right.  Do you have anything else

18   on the matter?

19             MR. JAMES:  Not with respect to the Part 1, which

20   is the court email production, Your Honor.

21             THE COURT:  Okay.  What is the issue with Part 2?

22             MR. JAMES:  Counsel in this case have exchanged

23   emails concerning requests by plaintiff that we made in

24   March of 2015 that the State Department consider our request

25   to exclude all press clippings, and so far all of the three

1    productions that we've received with respect to Part 2 have

2    been nothing but press clippings.  There seems to be a

3    misunderstanding about the scope of the request and/or what

4    is required of the State Department with respect to these

5    productions.

6         THE COURT:  All right.  Mr. Prince, do you want to

7    respond to the press clippings issue?

8         MR. PRINCE:  Thank you, Your Honor.

9         The only possible misunderstanding is that State

10   might be producing things that it should have determined to

11   be responsive, but the Court's --

12        THE COURT:  Nonresponsive.

13        MR. PRINCE:  Nonresponsive, thank you.  But that

14   doesn't change what the State Department has to do.  The

15   Court's order, which was entered by agreement of the parties

16   on this point, says specifically that State's goals for each

17   month, a number of pages, can be met by deeming documents to

18   be nonresponsive by producing them or by referring them for

19   consultation to third agencies.  So that's what we have to

20   do each month.  A certain number of pages have to reach

21   that.

22        The documents that have been produced to plaintiff

23   on Part 2 are all emails or attachments to emails, and there

24   was a search that was done.  I presume it had "OWS" and

25   "Occupy Wall Street" and some other search terms that came

1    up with emails.  In this case I think most of them seemed to

2    be, from ones we can tell, from Former Deputy Secretary

3    Burns.  But they're emails, and there is no way, when you're

4    searching emails, to say, "Well, give me everything with the

5    word 'Occupy Wall Street' but leave out the press

6    clippings."  You just can't do it.  They're just text

7    documents, and they get searched.

8         So these are sitting in a batch for the FOIA

9    office to review, and they're reviewing them.  They reviewed

10   700 pages, then 800 and 900 pages, as per your order, and

11   these were press clippings.

12        And that makes quite a bit of sense.  These are

13   very large documents.  They're consolidated press clippings,

14   and they had to be reviewed.  They were searched way before

15   the priority list was ever given to the State Department so

16   this was the first search that was done.  That's why they're

17   being done now, and they're just -- they have to be

18   processed, and part of processing is determining whether or

19   not they're responsive.

20        Now, we'll make sure that we stop sending things

21   if plaintiff doesn't want to receive them, but it doesn't

22   change the fact that State has been meeting the deadlines

23   each month that Your Honor set.

24        THE COURT:  All right.  Have all the Occupy Wall

25   Street documents been produced now, or are there still --

1              MR. PRINCE:  There's still a lot of them left.

2              THE COURT:  All right.  Mr. James, do you have a

3      response to that?

4              MR. JAMES:  Yes, Your Honor.  I think there are

5      two separate but related issues here that I did not

6      articulate well before.  The first issue is whether or not

7      these documents are responsive.  I don't know to what

8      document counsel is referring, but the Court's order itself

9      is clear that there are page requirements to be actually

10     applied to the pages that are going to be reviewed for

11     releasability, not to be reviewed for responsiveness.  So

12     that's a big distinction, and that is in the court order

13     itself, ECF 43.

14             So we're not sure where the dispute is arising

15     that they aren't allowed to count pages that they've

16     reviewed for responsiveness toward the total and then, for

17     whatever reason, simply provide those nonresponsive pages to

18     us.

19             The second related issue is that the Court ordered

20     plaintiffs to provide to the State Department most of the

21     search priority among the issues and custodians.  So we

22     supplied not only the subject matter list that includes

23     Occupy Wall Street, which we are clear and have agreement

24     with defendant on that they are allowed to continue to

25     complete their search for Occupy Wall Street records before

1    they move to the subject matter list that we supplied.  We

2    also supplied the custodian list that the Court ordered, and

3    it's our understanding that the defendant is not

4    transitioning its Occupy Wall Street searches to build in

5    order that list, and we were under the impression the

6    Court's order was -- did require the State Department to

7    begin incorporating this list by December 1st, specifically

8    with respect to the custodian locations that we wanted

9    searched, Your Honor.  So that's our second issue.

10             THE COURT:  All right.  Go ahead.

11             MR. PRINCE:  Your Honor, Counsel has left out

12   something very important about reviewed for releasability.

13   In the joint section, the part agreed to by the parties of

14   the joint status report that led to the Court's order on

15   this topic, there's a footnote that says, "'Reviewed for

16   releasability' means reviewing a document and, one,

17   determining that it is not responsive to the request; two,

18   referring the document to another agency for consultation;

19   or three, producing the document with redactions, if

20   appropriate, to plaintiff."

21             This language goes back to the very first offer we

22   got from plaintiff on how we would set schedules.  That was

23   never -- never resulted in a scheduling order, but this has

24   been the understanding from the beginning; that documents

25   are -- have been found by the searches, overbroad electronic

1    searches that make sure we get -- that reasonably find the

2    responsive documents.  State has to do something with them

3    to determine what's responsive, and plaintiff agreed in the

4    joint status report that reviewing for releasability

5    includes making a nonresponsiveness determination.  That's

6    what's been done.

7          Second, on the issue of the priority list, the

8    Court's order says that, and the parties -- I'm sorry, the

9    parties' same joint status report, which is ECF 41, says

10   that because the searches are still underway, State will

11   complete their review of the documents about the Occupy Wall

12   Street topic that have already been identified.  After that,

13   State will review documents according to the priority list

14   provided by plaintiff.

15         We're not supposed to look at the priority list

16   until Occupy Wall Street is done.  The Occupy Wall Street

17   search was completed in August.  We reported to the Court on

18   August 20th that 1,200 -- most of them very long --

19   documents had been found about Occupy Wall Street.  That was

20   before we received any priority list from the plaintiff,

21   before we even introduced the concept of a priority list in

22   filings to the Court.

23         So this search was done when there was no concept

24   that the priority list would include different people in

25   different orders, and so the documents are in one monolithic

1    bunch, and we'd have to basically restart the searches in

2    order to break them out by custodian, as plaintiff wishes.

3    That's simply -- because this agreement wasn't reached until

4    much later than this search being done, that's not possible

5    at this point.

6        THE COURT:  Now, you mentioned that these

7    documents are very large because they're consolidated press

8    clippings, so you have, what, a one-page email attaching how

9    many pages of press clippings?

10        MR. PRINCE:  In the last production, there were

11    six documents.  There were 91 pages.  But State still needs

12    to flip through them because sometimes you get multiple ones

13    and commentary.  There might be annotations or commentary,

14    and that's specifically what plaintiff said that they want.

15    They want press clippings if there's something on top or if

16    there's been annotations made.  It's just if they're clean,

17    but the only way to tell if they're clean is to look at them

18    page by page.  Obviously it's faster per page, but the point

19    is there are documents that take longer and documents that

20    take less time, and that's why we arrive at averages.

21        Your Honor, there's obviously a lot of litigation

22    about those page counts that you put in your order, and this

23    is basically a back-door attempt to increase State's burden

24    after we've litigated this issue and Your Honor basically

25    imposed a compromise between the two parties' positions.

1          THE COURT:  All right.  I wasn't prepared to deal

2     with the Part 2 issues today so I want the parties to meet

3     and confer and see if you can come to some resolution, and

4     if not, then plaintiff can file something on the record as

5     to their position on the dispute, and I'll resolve it.

6          With respect to the Part 1, the Hillary Clinton

7     emails and the 7,000 remaining pages, you know, the

8     government has put me between a rock and a hard place.  I

9     can either force them to disclose documents that, as the

10    media has reported, are ripe and full of sensitive

11    information without further processing, or I can -- or I'm

12    forced to grant them the extension that they sought due to

13    their error, which is a position I don't like to be in.

14         So Mr. Prince, I want you to go back to your

15    client and then by the end of the day tomorrow file

16    something with me that explains in detail why what had gone

17    through final review can't be produced before the 18th with

18    very specific descriptions of what each step is and how much

19    time each step takes, and also explains why any alternate

20    method of either letting plaintiff come sit in front of a

21    screen and look at the documents or alternatively just

22    printing them out or sending a PDF over to plaintiff can't

23    be done any faster.

24         MR. PRINCE:  Okay.

25         THE COURT:  And I'll decide, based on that

1    information, but the Department should expect to produce

2    something on the 18th --

3              MR. PRINCE:  Okay.

4              THE COURT:  -- if not sooner.

5              MR. PRINCE:  Okay.

6              THE COURT:  All right.  I also want you to submit

7    something by the end of the week that has a detailed

8    explanation of how this problem arose, what caused it, why

9    it wasn't noticed until just recently.  All right?

10             MR. PRINCE:  Okay.

11             THE COURT:  Anything else from the government?

12             MR. PRINCE:  No, Your Honor.

13             THE COURT:  Anything else from the plaintiff?

14             MR. JAMES:  No, Your Honor.

15             THE COURT:  Now, if I tell them they have to make

16   those documents available for you on a screen faster, are

17   you going to have someone to go look at them?

18             MR. JAMES:  I would have to consult my client, but

19   I can get an answer to the Court fairly quickly.  He's out

20   of the country on assignment, but I believe he's back

21   tomorrow afternoon.

22             THE COURT:  Okay.  Let me know that because I

23   don't want to force the government to do something that is

24   going to benefit no one.

25             MR. JAMES:  Yes, Your Honor.

1          THE COURT:  All right.

2          All right.  You're excused.

3          MR. PRINCE:  Thank you, Your Honor.

4          MR. JAMES:  Thank you, Your Honor.

5              (Whereupon the hearing was

6              concluded at 3:01 p.m.)

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10          I, LISA A. MOREIRA, RDR, CRR, do hereby

11   certify that the above and foregoing constitutes a true and

12   accurate transcript of my stenographic notes and is a full,

13   true and complete transcript of the proceedings to the best

14   of my ability.

15      Dated this 25th day of February, 2016.

16

17                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
18                          United States Courthouse
                            Room 6718
19                          333 Constitution Avenue, NW
                            Washington, DC 20001
20

21

22

23

24

25