```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3    JASON LEOPOLD,                ) Civil Action
                                    ) No. 15-123 (RC)
 4                  Plaintiff,      )
                                    ) STATUS CONFERENCE
 5    vs.                           )
                                    ) Washington, DC
 6    DEPARTMENT OF STATE,          ) Date:  November 10, 2015
                                    ) Time:  2:30 p.m.
 7                  Defendant.      )
      _____
 8
                   TRANSCRIPT OF STATUS CONFERENCE
 9                         HELD BEFORE
               THE HONORABLE JUDGE RUDOLPH CONTRERAS
10                  UNITED STATES DISTRICT JUDGE
      _____
11
                      A P P E A R A N C E S
12

13    For the Plaintiff:      Ryan Steven James, Esq.
      (appeared               Law Office of Ryan S. James
14    telephonically)         5208 Capricorn Loop
                               Killeen, Texas  76542
15                             254-289-7459

16

      For the Defendant:      Robert J. Prince, Esq.
17                            Marcia Berman, Esq.
                              US Department of Justice
18                            20 Massachusetts Avenue, NW
                              Washington, DC  20001
19                            202-305-3654

20
      Proceedings reported by machine shorthand, transcript
21    produced by computer-aided transcription.
      _____
22
      Court Reporter:         Annette M. Montalvo, CSR, RDR, CRR
23                            Official Court Reporter
                              United States Courthouse, Room 6722
24                            333 Constitution Avenue, NW
                              Washington, DC  20001
25                            202-354-3111
```

1        (WHEREUPON, commencing at 2:35 p.m., the following

2    proceedings were had in open court, to wit:)

3        THE COURTROOM DEPUTY:  Civil Action 15-123, *Jason*

4    *Leopold v. US Department of State*.

5        Counsel, please state your appearances for the

6    record.

7        MR. JAMES:  Good afternoon, Your Honor.  This is

8    Ryan James, appearing telephonically for plaintiff Jason

9    Leopold.

10        And, Your Honor, I believe both parties have some

11    corrections to make to the Court regarding data in the joint

12    status report submitted on October 30.

13        THE COURT:  Okay.

14        MR. PRINCE:  Hello, Your Honor.  My name is Robert

15    Prince with the Department of Justice.  With me at counsel's

16    table is Marcia Berman, also from the Department of Justice.

17        And we do have corrections to make.

18        THE COURT:  Okay.  Since Mr. James is on the

19    phone, why don't you just stay at the podium so we can talk

20    about these various issues.

21        Why don't you start with the corrections,

22    Mr. Prince.

23        MR. PRINCE:  Thank you, Your Honor.

24        The corrections are to, first, on page 5 of the

25    status report that was filed in paragraph 8, there were

1    several percentages that were given.  There was a

2    mathematical error underlying them.

3              So in that paragraph, the first percentage given

4    is 6 percent of the total FOIA litigation reviewers, that

5    should be 1.3 percent.  And where it says 56 percent, that

6    should say 51.3 percent.  And then on the same page, where

7    it says that plaintiff's proposal requires 33 percent of all

8    FOIA litigation reviewers for Part 2, that should say 7.7

9    percent.

10             THE COURT:  That's quite a difference.

11             MR. PRINCE:  Yes.  It's just the way the math

12    worked out.  There was a denominator issue.

13             And then where it says 56 percent of total FOIA

14    litigation reviewers, it should say 51.3 percent.

15             THE COURT:  Okay.

16             MR. PRINCE:  And, basically, the same edits had to

17    be made in the declaration.  The declarant is out of town.

18    I have not had a chance to clear them with him, but his

19    staff has reviewed the numbers.  We've obviously taken great

20    care, having noticed the error, to review them.

21             So the only number that wasn't mentioned there,

22    where it says 11 percent, it should be 2.7 percent.  That's

23    the percentage of non-Clinton e-mail FOIA litigation

24    reviewers dedicated to the case under State's plan.  And

25    then --

1          THE COURT:  Repeat that one again?

2          MR. PRINCE:  Under State's plan, 2.7 percent of

3     all the FOIA litigation reviewers who are not working on the

4     Clinton e-mails would be dedicated to Part 2 of the FOIA

5     request, instead of the 11 percent that was given.

6          And then the other difference is -- let's see.

7     Plaintiff's proposal requires 7.7 percent -- oh.  The other

8     numbers I've corrected.

9          THE COURT:  Okay.  And, Mr. James, you have some

10    corrections as well?

11         MR. JAMES:  Yes, Your Honor.

12         At the bottom of page 11, footnote 10, to our

13    paragraph 28 of the joint status report, it incorrectly

14    states that plaintiff has only 3 other FOIA requests in

15    litigation with defendant.  Actually, the sum of that number

16    is up to four.  That fourth case does not have a production

17    obligation.

18         THE COURT:  Okay.

19         MR. JAMES:  But I also need to correct, in the

20    second sentence, I state incorrectly that there are 700

21    pages per month commitment in all three of those cases.

22    That overstates the commitment.  And the third case, instead

23    of 700, we agreed to 400 pages.

24         THE COURT:  That's the case in front of Judge

25    Boasberg?

```
 1                   MR. JAMES:  The case where we request only 400

 2      pages is regarding records from the State Department with

 3      respect to a branch known as their air wing.

 4                   THE COURT:  Is that 14-1770?

 5                   MR. JAMES:  Yes, Your Honor, 14-1770.

 6                   THE COURT:  And then the case in front of Judge

 7      Chutkan is 700, the case in front of Judge Amy Jackson is

 8      700, and the case in front of Judge Mehta is no schedule

 9      yet; is that correct?

10                   MR. JAMES:  Yes, Your Honor.

11                   THE COURT:  Okay.  All right.  Let me start with

12      the government.

13                   Mr. Hackett's declaration is somewhat ambiguous

14      about how we shouldn't assume that there's not -- that there

15      will be more resources when they are done with the Clinton

16      e-mails, which didn't make any sense to me.  So why don't

17      you explain that to me.

18                   MR. PRINCE:  It is not that there won't be any

19      more resources, it is that we can't be sure how many there

20      will be.  And there's two primary reasons for that.  Well,

21      there's an overarching reason in that it is just hard to

22      predict because of the way it is structured there, more than

23      a couple months ahead.  And, obviously, the end of the

24      Clinton e-mails is more than a couple months ahead.

25                   But the more specific reasons is, first, there is
```

1    this idea of a cap.  The program under which they are hired

2    has a cap of 1,040.  That's half of a full-time person over

3    what's called an appointment year.  That starts the day they

4    started on this program, and so it is different for each

5    person.  And in order to aggressively make sure we meet the

6    schedule, many of them have been working more than they

7    normally would.  And so the expectation is that many of them

8    will hit their cap at or soon after the completion of that

9    project.  We don't know how many because there's still

10   several months to go, but we wanted to make sure it was

11   clear that it might be the case that some of the

12   reviewers -- and we tend to -- the State tended to use the

13   more senior reviewers for the Clinton e-mail review just to

14   make sure it got done on time.  Some of those might not be

15   able to work for some amount of time after the project is

16   done.

17         The second is, as I think the declaration made

18   pretty clear, that's a lot of flexibility on the part of the

19   workers as to when they work and when they don't, and we

20   just don't know how many might decide after working so hard

21   and pushing through on this project for approximately eight

22   months, how many might decide to take some time off, even if

23   they have hours left under the cap.  And there's not much to

24   be done about that if it happens.

25         THE COURT:  But at the same time, they are engaged

1    in this process of hiring 50 additional people?

2          MR. PRINCE:  That's correct.  25 of whom,

3    hopefully, if everything goes well, will be reviewers.  But

4    that's going to take a while to come into effect.  My

5    understanding is that -- if you recall the declaration that

6    was filed in mid-October, the idea was to bring people on in

7    the middle of each month in kind of classes.  And it also

8    noted that it could take up to 120 days to get clearances

9    for people who don't have them.  So the earlier batches will

10   be smaller than the later batches.  The batch for this

11   month, I believe, is going to be one new reviewer.  And then

12   it should increase, you know, in December, January, and

13   probably February.  After that, they still need training in

14   order to become productive.  So there's still some time

15   before they are on board.  And until that's done, it is hard

16   to say when they will be available for this kind of work.

17         THE COURT:  So come February 2016, I can't rely on

18   more resources from both of those sources being on line?

19         MR. PRINCE:  Your Honor, probably there will be

20   some more resources.  There also might be more cases with

21   production schedules by then.  There have been, I think, ten

22   new cases filed in the last month or so that will have

23   production schedules.  The problem is, we couldn't predict

24   or give you a number how many.  The Court asked for concrete

25   details about the percentages, and we just can't project

1    that far ahead.  So I can't stand here and say there will be

2    nothing extra available to spread out across all the cases,

3    but I can't tell you what it would be.

4            THE COURT:  Okay.  Let me ask you a little bit

5    about the math, which I guess is probably not a good subject

6    to ask about, given your earlier corrections.

7            In the declaration, Mr. Hackett says -- puts an

8    estimate of one primary reviewer at 10 hours a week.

9            MR. PRINCE:  Yes.

10            THE COURT:  And one senior reviewer at five hours

11    a week would result in 350 documents a month.

12            MR. PRINCE:  Correct, Your Honor.

13            THE COURT:  Those numbers are still correct --

14            MR. PRINCE:  Yes.

15            THE COURT:  -- to the best of your knowledge?

16            MR. PRINCE:  It was just the math calculations of

17    percentages.

18            THE COURT:  Now, I tried -- given that the Clinton

19    e-mails, you know, the previous month was 7,000 e-mails

20    at -- based on the work of 14 FTEs, the math doesn't seem

21    equivalent.  Do you have any -- 7,000 documents at 14 FTEs

22    comes out to about 500 documents a month per FTE.  And it

23    doesn't seem to be equivalent.  Do you have any insight into

24    the differences?

25            MR. PRINCE:  Well, Your Honor, if I could scribble

1    a calculation for a second.  So we are proposing less than

2    an FTE here.

3               THE COURT:  I understand that.  If you ramp it up

4    to one FTE, it comes out to about 1,400, I think.

5               MR. PRINCE:  There's a couple things, Your Honor.

6    First of all, the reviewers, when they normally do reviews

7    in normal cases, they handle coordination.  For example,

8    when something is sent to an interagency for review, that's

9    done by the reviewers.

10               Here, because of the importance of the Clinton

11    e-mail project, they brought in a lot more administrative.

12    And I think we've documented there's been more

13    administrative help brought on because it was hard to bring

14    on the reviewers.  And they tried to pull off tasks that are

15    normally handled by reviewers as much as they could.  So

16    there's that.

17               The other thing is that the Clinton e-mail review

18    was using more senior reviewers, and I can't quantify that,

19    but that is a difference.  And they are also, obviously,

20    highly sensitive.  So I don't --

21               THE COURT:  Are the e-mails from some of these

22    other officials going to be any less sensitive?

23               MR. PRINCE:  No.  In fact, some of them might be

24    more.  In fact, there's going to be things that are deemed

25    classified at the beginning of the review process, whereas

1    there aren't any of those for the Clinton e-mails.  So I can

2    take a look.

3          The other thing to remember is that the documents

4    that were produced in the last production, some of those

5    were reviewed much earlier.  It is a step-wise process.  So

6    we are seeing work that was done over a spread of months.

7    It is much harder to kind of assign.  Things are being done

8    in batches and move forward in a regimented fashion.  So I

9    don't know that we can say that 7,000 being produced on

10   October 30 means that there were 7,000 reviewed by those 14

11   FTEs.

12          THE COURT:  In the month of October.

13          MR. PRINCE:  In the month of October.

14          THE COURT:  All right.  So if I take that estimate

15   of the ten hours a week for the primary reviewer, and the

16   five hours a week of the senior reviewer, if I extrapolate

17   that up, does the math still work with reality?  If I just

18   quadruple that to 40 hours and 20 hours, does that just

19   quadruple the amount of documents per month?  Is that

20   rational?

21          MR. PRINCE:  I am not sure it would, Your Honor,

22   because that would have to mean the introduction of new

23   reviewers because there aren't full-time reviewers.  And the

24   other problem would be right now there's only one NEA

25   reviewer, a senior reviewer, that's Near-East Affairs, who's

 1    not fully dedicated to the Clinton e-mails.

 2             So the fact -- as you add more people, you also

 3    increase overhead as far as coordinating and things like

 4    that.  I don't know how that works out.

 5             So this was actually very specific, the estimate.

 6    The State Department actually saw the chart of reviewers in

 7    there, and it was done by looking at who's available,

 8    looking at their caseload.  Some are handling seven or eight

 9    cases right now, some are handling one, and just trying to

10    come up with kind of precisely what we could dedicate to

11    this case.

12             THE COURT:  The Clinton e-mails, when were they

13    turned over?  In December of 2014?

14             MR. PRINCE:  Correct, Your Honor.

15             THE COURT:  Okay.  So we are coming close to a

16    year?

17             MR. PRINCE:  Yes.

18             THE COURT:  What resources, if any, have been

19    added in the course of those 11 months?

20             MR. PRINCE:  I don't have specific numbers.  I

21    know that there were administrative people added.  There

22    were some reviewers added.  I don't know the precise

23    numbers.  That's where we get the 14 FTE reviewers, but I

24    don't know -- the big push is for the detailees that started

25    in the beginning of September.

1          THE COURT:  The plaintiff's claim that the Clinton

2     e-mails shouldn't be counted against them because it is for

3     the public benefit and it is based in part on what State has

4     decided to do, why isn't that argument persuasive?

5          MR. PRINCE:  Your Honor, there's a couple of

6     things.  First of all, the Clinton e-mails, if you discount

7     them, then you have to discount the resources being

8     dedicated to them as well.

9          Second, you have to remember what the original

10    FOIA request in this case was.  Now, we are not saying that

11    all of it should be counted against the plaintiff.  We have

12    made arguments that it is responsive in many cases.  But

13    there are only, as far as I know, two other cases where

14    people have requested the entire collection.  And that's in

15    fitting with what the original FOIA request was in this

16    case, which was for everything that had ever been seen by or

17    given to or referred to Clinton, I mean, was for most of the

18    documents, the State department, and it required

19    negotiation.  These were clearly on point with that very

20    broad FOIA request.

21         And plaintiff is the party that gets to argue in

22    front of you about the schedule.  They have extra -- you

23    know, they have standing that others don't right now as far

24    as the disclosure of these e-mails go.  They are also one of

25    only three that are seeking the whole set.  So while you

1    might not account all of it to them, I think a large

2    percentage goes to what they are seeking, which is insight

3    into how former Secretary Clinton managed the State

4    Department in her term there.

5         THE COURT:  But the decision to put all of the

6    e-mails on the public record, that was a decision

7    independent of this case, wasn't it?

8         MR. PRINCE:  Yes, Your Honor.  But had that

9    decision not been made, then we wouldn't be talking about

10   producing records here, we would be dealing with the summary

11   judgment motion or motion to dismiss that we had filed

12   saying that this was an improperly broad FOIA request.  And

13   that argument was very strong.  There was lots of precedent

14   that said that this was not a proper FOIA request.  However,

15   that precedent says that you have to compare the burden to

16   other things going on.  And so once the State Department

17   decided to produce them, we, obviously, couldn't come here

18   and argue it was too much of a burden to produce them.  They

19   were responsive to the request.

20        But the fact of the matter is, they are being

21   produced in this case under an order that was argued for by

22   plaintiff, and that if they weren't being produced, we

23   wouldn't be talking about these other 11 FOIA requests, any

24   one of which would make a significant case on its own.

25        THE COURT:  Okay.  Are there any other points you

```
 1    want to make before I hear from the plaintiff?

 2              MR. PRINCE:  Yes, Your Honor.  And that is that

 3    even if we don't count the Clinton e-mails against them,

 4    there's still a large percentage of resources that are being

 5    spent under our plan and even more so under their plan.

 6    Their plan calls for approximately 15.3 percent of all the

 7    resources other than what's being used for Clinton.  So if

 8    we prorate the 350 pages, as we have discussed, their 2,000

 9    pages of the month, they want approximately a sixth of all

10    the other FOIA litigation resources.  That's too much, when

11    there are 28 cases with orders now, and more to come,

12    significantly more to come.  So, still, even if we don't --

13    basically, our position does not rely on counting the

14    Clinton e-mails as credited against plaintiff.  It is still

15    disproportionate what they are asking for.

16              THE COURT:  Okay.  Thank you.

17              Mr. James?

18              MR. JAMES:  Yes, Your Honor.

19              I'd first like to say that I think the point

20    raised that we wouldn't be talking about this because this

21    portion would have been dismissed if it weren't for the

22    Clinton e-mail is easily dismissible as a red herring.  Case

23    law is pretty clear that plaintiff always has an opportunity

24    to narrow.  We would have obviously narrowed even if the

25    Clinton e-mails didn't exist.  So that's really not
```

1    relevant, and I don't want to waste too much of the Court's

2    time with that.

3              With respect to the issue that there are 29 other

4    cases for which production obligations exist, whether by

5    court order or negotiated agreement between the parties,

6    that's nice to know, but it is not comparing apples to

7    apples.

8              And I think for the defendant to have met the

9    burden imposed on him by the Court's order, it needed to

10   state what exactly those production obligations were for

11   each case, or even an aggregate number would have provided a

12   relevant data point for the Court.  They failed to provide

13   what their monthly page processing obligations for the other

14   cases actually is.

15             Additionally, as the Court noted, something just

16   doesn't add up when you look at the number of FTEs assigned

17   to the Clinton e-mail portion of this case versus the

18   percentages they provide with respect to what it takes

19   percentagewise to produce 350 pages a month.  And I believe

20   the answer is because they are not comparing, again, apples

21   to apples.  They switch from talking about FTE positions to

22   talking about how many man-hours are required to make a

23   certain number of pages available or, rather, to process a

24   certain number of pages per month.

25             So the correct data point is not the number of

1    FTEs assigned to the Clinton e-mail production, it is the

2    number of man-hours.  And if you look at the third

3    declaration of Mr. Hackett, he makes the -- he includes

4    information stating approximately 40 total FTE reviewer

5    positions, instead of just the 28 that are noted, 14,

6    roughly, assigned to the Clinton e-mail review, and 14 that

7    are not assigned, but are available for litigation purposes.

8              And I think that in footnote 4 to the joint status

9    report, we find these other missing FTEs, and they are

10   simply just not assigned to litigation at this point in

11   time.  They are assigned to nonlitigation, but they are

12   still reviewer positions.  And if you take those total of 40

13   FTE reviewer positions, and you take a standard month, which

14   would be four weeks of 40 hours per week, you get a total of

15   6,400 man-hours of availability for the reviewers.  If you

16   take the rate of 15 man-hours to yield 350 pages, that is

17   5.38 pages per man-hour.  That yields a capacity for the

18   reviewers in that office of 34,432 pages per month.

19             You can then take that pages per month number and

20   compare it to the number of pages that they are required to

21   process each month for the Clinton e-mails, and instead of

22   yielding approximately 50 percent of their capacity, for

23   example, the 15 percent of the Clinton e-mails that are due

24   at the end of November yields 7,868.25 pages of the total

25   approximately 52,455 pages of the Clinton e-mails.  That's

1    only 22.85 percent of the monthly capacity of pages that the

2    office can process.

3         If you add in 2,000 pages, that brings the total

4    resource allotment up to 28.65 percent of their monthly

5    capacity, much lower than the 50 percent number.  The 51

6    plus percent number that they are suggesting would apply to

7    only 350 pages additional burden.  And I think the problem

8    is, is that they took those 14 FTE equivalents, and they

9    said, "Well, it is half of our FTEs, so that's 50 percent."

10   But that doesn't necessarily represent the available

11   man-hours based on the fact that some of these folks are

12   taking vacation, et cetera, for all the reasons that the

13   defendant has already pointed out.

14        So when you switch to comparing apples to apples,

15   strictly going by page numbers per hour, you yield much more

16   representative percentages, suggesting that this case is not

17   imposing as large a burden as the State Department would

18   like the Court to believe.

19        And the last point, Your Honor, is that the

20   Department doesn't even attempt to answer the second

21   question posed in the Court's order, which is to say how the

22   allocation of resources in this case is affecting the

23   agency's ability to respond to pre-submitted FOIA requests

24   or to comply with competing production orders in other

25   cases.  There's simply no information about what these

1      orders are, how many pages they have to review, and whether

2      or not they make those commitments, whether or not they've

3      had to ask for extensions.  That aspect of the Court's order

4      is completely missing.

5              For these reasons, Your Honor, we don't think that

6      the Department has met the burden, and we would request that

7      this 2,000 page commitment, which is 5.8 percent under our

8      calculation additional burden at most, is almost exactly the

9      6 percent that they originally thought they were allocating

10     based on their incorrect data, 350 pages.  So given that 6

11     percent is now the 6 percent they said they were willing to

12     apply to this case, that 6 percent does equate to more than

13     2,000 pages, and we would be happy to take that 6 percent

14     when it is correctly converted to page numbers.

15              THE COURT:  Okay.  I am just curious -- and that

16     was a lot of math, which is the reason I went to law school.

17              How many -- assuming a reviewer is working 40

18     hours a week, how many reviewers do you think should be

19     dedicated to your FOIA request?

20              MR. PRINCE:  Your Honor, I don't have an exact

21     answer to that question.  I simply looked at the overall

22     numbers, man-hour availability, and wanted to provide the

23     Court with our understanding of what those numbers meant to

24     give it a more clear picture of what percentage of their

25     capacity we would be taking up.  And I don't think that

1    adding 2,000 pages to create a total, for this month, of

2    28.65 percent, given the other arguments in our portion of

3    the joint status report that the Court today noted, for

4    example, that there are two other persons seeking the entire

5    set of Secretary Clinton's e-mail, as well as numerous other

6    parties that are seeking subsets of those e-mails.  Given

7    the new numbers today, that this, you know, is fairly, fully

8    assignable to Mr. Leopold, and that when you take the

9    portion that might be solely assignable to him, it certainly

10   doesn't exceed his fair share.  And that it also, on a

11   practical sense, is doable.

12            THE COURT:  Let me ask you this question:  I think

13   it is a fair point that you make that the Clinton e-mails

14   shouldn't be counted against you, but should your other

15   three FOIA requests be counted against you when it talks

16   about what your fair share is?

17            MR. JAMES:  I think to the extent that a

18   legitimate crisis may exist at the State Department, setting

19   aside the points we raised about that crisis being the

20   Department's own making and completely foreseeable, just

21   looking at what we actually have the capacity to do now, we

22   do think it would be fair for the Court to consider,

23   obviously, in trying to determine what is actually possible,

24   what other FOIA requests any given plaintiff may have in

25   litigation such that it takes up Department resources.

1          We would think that mitigating against that would

2     be the foreseeability of the crisis that has resulted and

3     their actions to address it.  Calculating in those numbers,

4     it is, as we noted, 702 cases and 400 in other cases, that's

5     800 pages, I believe, that's only maximum.  And, again, we

6     just got these revised numbers two hours ago, Your Honor.

7     So I calculate that as only being approximately 5 percent of

8     the total capacity being spent on those three other cases

9     combined.  And I would also note, Your Honor, that in

10    negotiating those production obligations, Mr. Leopold had in

11    mind his priority of which case he wanted to have the most

12    resources allocated to, and specifically accepted negotiated

13    production numbers that would allow for him to place more

14    priority on this case, such that defendant is essentially

15    getting a second bite at the apple because he already

16    negotiated a lower production number in other cases with

17    plaintiff Mr. Leopold, and are now attempting to, you know,

18    get a lower production in this case as well.

19          THE COURT:  So if I come up with a number, and

20    say, you know, "Mr. Leopold, this is your fair share of

21    total State Department resources, and whatever they produce

22    in this case, we are going to subtract the 1,800 a month

23    from the other three cases," can you renegotiate priorities

24    amongst the various cases?

25          MR. JAMES:  I am not entirely certain how that

1    would work, given that the State Department's process for

2    assigning FOIA litigation doesn't assign the case -- it

3    doesn't leave us with one attorney or contact to work with

4    on all these cases.

5         Additionally, I think that would be giving a

6    disservice to FOIA litigants, particularly the type for

7    which fee waivers are available, such that they are

8    performing an important function that's recognized by the

9    statute for seeking records for the better information,

10   making it better available to the public.

11        So I think that you might be able to say it is not

12   fair to say that a journalist who is filing FOIAs should be

13   on the same grounds or have the same fair share allotted to

14   journalists that would be allotted to it by a citizen who is

15   seeking records for a strictly personal reason that does not

16   generate public benefits.  So in that sense it would be hard

17   to pin down what any one person's fair share might be.  And

18   I think it would also be relevant to consider the fact that

19   there's been a trend lately for agencies to not as a

20   courtesy provide information to journalists but to say, "The

21   FOIA process, if you want to have information, our

22   spokesperson is not going to provide it anymore, you have to

23   go the route of FOIA."

24        So there's been a concerted effort, I think, to

25   shuffle journalists, and this is certainly the case with

1    Mr. Leopold, to the FOIA line, instead of simply engaging in

2    an open government discussion, a provision of records on an

3    informal basis, such that that's one of the reasons why

4    Mr. Leopold has as many cases as he does.

5            THE COURT:  All right.  Are there any other points

6    you want to make before I turn it back to the government?

7            MR. JAMES:  No, Your Honor.  Thank you.

8            THE COURT:  Thank you.

9            Mr. Prince, is there anything you want to respond

10   to there?

11           MR. PRINCE:  I think just two quick points,

12   Your Honor.

13           First, I have had not a FOIA case that doesn't

14   involve one of these repeat litigants who claim FOIA fee

15   waivers.  So I am not sure if that would change anything in

16   the calculations.

17           Second, 5.8 percent, which is I think what

18   plaintiff calculated, I am not going to say I agree with

19   that number, I don't know, haven't had time to do the math,

20   but that's still a larger percentage than they are due for

21   this case, and, you know, it is just an example of what

22   there is to deal with.

23           Finally, the 18 people who don't work on FOIA

24   litigation but are FOIA reviewers, they are doing

25   statutorily required duties right now.  They are dealing

1    with other FOIA requests that haven't reached litigation,

2    they are dealing with FOIA appeals, and they are dealing

3    with mandatory declassification review.  That's listed in

4    the declaration.  That's why we didn't include them in the

5    roster.  We included in the roster people who are capable of

6    working on this FOIA request based on the subject matters

7    involved.  So I don't think that those points actually

8    refute anything that the State Department presented in its

9    declarations.  Thank you.

10              THE COURT:  Thank you.

11              All right.  Just because December 1 is right

12    around the corner, we are going to start off with 700 pages

13    from the State Department, and I will take the rest of it

14    under advisement.  And my inclination is to come up with an

15    overall number, and whatever's being produced in the other

16    three FOIA cases, to the extent once the fourth one gets

17    production scheduled, will be subtracted from that overall

18    number.  So Mr. Leopold gets one percentage of the State

19    Department's resources.  So that that number's likely to be

20    a larger number, but when you pull out the 1,800 a month

21    documents that are being produced in the other cases, it

22    will be less than what he's demanding in this case.  And,

23    you know, I think the State Department's response to

24    resources has been somewhat lackadaisical given that the

25    e-mails were produced in December of last year.  So the

1    emergency is somewhat of its own doing, at least the

2    response has been lacking.

3            So I do intend to impose a schedule similar to the

4    Clinton e-mail that ramps up over time, and the big ramp-up

5    will take place once the Clinton e-mails are done in

6    February.  So with those general outlines, I will come up

7    with an order that's more specific.

8            Is there anything else we need to resolve today?

9            MR. JAMES:  Yes, Your Honor.  I would just ask

10   that the Court be cognizant of the issue that we raised

11   regarding whether or not the resources allocated to the

12   Clinton e-mail review should be assigned to plaintiff in its

13   order, for it to indicate out of whatever percentage the

14   Court ends up deciding on, whether or not resources

15   allocated to the Clinton review are supposed to be

16   subtracted from that percentage, or whether or not they are

17   supposed to be excluded entirely or somehow discounted, so

18   that there's no confusion amongst the parties about what's

19   to be counted against the number that the Court decides is

20   Mr. Leopold's fair share.

21           THE COURT:  Well, I am inclined to agree with you

22   that that process is one that shouldn't be wholly attributed

23   to you, but it is a process that takes up approximately half

24   of the resources there.  So it limits what's available for

25   the other parts of the request.

1          All right.  Anything else we need to resolve today

2     from either side?

3               MR. JAMES:  Not from plaintiff, Your Honor.

4               MR. PRINCE:  Not from the government, Your Honor.

5               THE COURT:  Okay.  So I will send out a minute

6     order on the 700 documents for December 1 and the other

7     parts that were not contested, the monthly production

8     starting December 1, and the searches being completed by

9     December 31, as far as the prioritization that the parties

10    agreed on.  And then we'll provide more specifics on the out

11    months from there.

12              MR. PRINCE:  Thank you, Your Honor.

13              One other thing.  Just the definition of

14    "releasability" was agreed to by the parties, and it is not

15    necessarily intuitive.  So I just want to point that out to

16    Your Honor.  It is in footnote 1.

17              THE COURT:  Okay.  But I don't need to include

18    that in an order, do I?

19              MR. PRINCE:  Not as long as everyone's on that

20    understanding.  Thank you.

21              THE COURT:  Thank you.

22              (WHEREUPON, at 3:10 p.m. the proceedings were

23    concluded.)

24

25

1    UNITED STATES DISTRICT COURT )
                                 )   ss.
2    EASTERN DISTRICT OF NEW YORK )

3

4

5                          **REPORTER'S CERTIFICATE**

6

7

8              I, ANNETTE M. MONTALVO, do hereby certify that the

9    above and foregoing, consisting of the preceding 25 pages,

10   constitutes a true and accurate transcript of my

11   stenographic notes and is a full, true and complete

12   transcript of the proceedings to the best of my ability.

13              Dated this 2nd day of March, 2016.

14

15                            _____/s/Annette M. Montalvo_____
                              Annette M. Montalvo, CSR, RDR, CRR
16                            Official Court Reporter
                              United States Courthouse
17                            225 Cadman Plaza East
                              Room N330
18                            Brooklyn, New York  11201
                              718-804-2711
19

20

21

22

23

24

25